UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CASTLE EQUIPMENT COMPANY,
Plaintiff

vs. C.A. NO.: 07-98S

UNITED STATES FIRE INSURANCE COMPANY,
Defendant/Third-Party Plaintiff

vs.

ANTHONY F. ROSCITI, JR.,
Third-Party Defendant

DEPOSITION OF ANTHONY F. ROSCITI, JR., in the above-entitled cause, taken on behalf of the Defendant, United States Fire Insurance Company, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at the offices of Orson & Brusini, Ltd., 325 Angell Street, Providence, Rhode Island, on Friday, June 6, 2008, convening at 9:00 a.m.

Allied Court Reporters, Inc.
115 Phenix Avenue
Cranston, Rhode Island 02920
(401) 946-5500

A P P E A R A N C E S

FOR THE PLAINTIFF...... LEPIZZERA-LAPROCINA, LTD.
BY: SCOTT K. DEMELLO, ESQ.
BY: PAUL LAPROCINA, ESQ.

FOR U.S. FIRE INSURANCE..McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
BY: ADAM R. SCHWARTZ, ESQ.
BY: CHRISTOPHER KUNKEL, ESQ.
ORSON AND BRUSINI, LTD.
BY: STEPHEN J. BROUILLARD, ESQ.

FOR ANTHONY ROSCITI, JR..FERRUCCI RUSSO, P.C.
BY: CHRISTOPHER MULHEARN, ESQ.

Q. And how many employees does South Shore have in, say, 2006, before it went into receivership?
A. Around a hundred.
Q. Were there any employees of South Shore who ever worked for Castle?
A. No.
Q. Who was Chad McCloud?
A. He was my controller.
Q. And so, he was your controller at South Shore?
A. Yes.
Q. And do you know, did Chad McCloud provide any services for Castle?
A. Not that I can recall.
Q. And does South Shore have any interest in any other companies?
A. Not that I can recall.
Q. And were you president of South Shore from 2000 to 2006?
A. Yes.
Q. And what were your duties and responsibilities at South Shore?
A. Day-to-day operations.
Q. Were you paid a salary -- let me rephrase the question. How much, if any, salary were you paid by South Shore in 2003?

Q. I'm going to ask you some questions now about Castle Equipment. Do you remember when Castle Equipment was formed?
A. Maybe 2004, 2003.
Q. And does Castle Equipment still exist today?
A. Yes.
Q. And what was your position with Castle Equipment when it was formed?
A. President.
Q. And are you still president of Castle Equipment today?
A. Yes.
Q. And you've been president the entire time?
A. Yes.
Q. And did you provide any startup capital when you formed Castle?
A. I don't recall.
Q. Do you remember if anyone else provided any startup capital besides yourself?
A. I don't recall.
Q. What percentage of the stock do you own of Castle Equipment?
A. Seventy percent.
Q. And is that how much you've owned since the formation of the company?

A. Yes.
Q. And who owns the remaining thirty percent?
A. Dan Clifford.
Q. And what's Dan Clifford's position with Castle?
A. He's in charge of sales, and basically the general manager.
Q. And how long has he been with Castle?
A. Since we formed the company.
Q. What is Castle's business generally?
A. It's an equipment sales and supply company.
Q. And how did you come to know Dan Clifford?
A. I was doing business with him with South Shore.
Q. So, was he with another equipment supply company before?
A. Yes.
Q. Do you remember which company?
A. I don't recall.
Q. And why did you decide to get into the equipment supply business?
A. I was bored.
Q. I don't doubt that you're very good at everything you do, but before you were in the site work contracting business, very particular business, any company --
A. It goes hand and hand with almost everything

as Clifford 3, which is Anthony Rosciti, Jr.'s answers to U.S. Fire's interrogatories. I'm going to hand you that, and ask you to look at it, and specifically I'm going to ask you about answer number six. I guess first I should ask you to please turn to page 13 for a second, please, of Exhibit 3 from the Clifford deposition. Is that your signature at the end of the interrogatories?

A. Yes.

Q. Now, if you can go back, please, to, I'm looking at answer number six, and in the middle of that answer you say that, I, it says, I, open quote, head, close quote, the business from an operations perspective, and further conduct sales, leasing and rental activities on an as-needed basis. Is that a fair statement of your role at Castle Equipment?

A. More or less, yes.

Q. What other things do you do at Castle Equipment as president of Castle, at least in general terms?

A. Oversee, review reports, review cash flow statements, review profit and loss statements, review cash, see what's needed as far as what programs we have of sales financing programs. I meet with all the corporate people from Terex.

Q. Is it fair to say then, that Dan Clifford is more

involved in the sale and leasing of equipment with the customers, where you're more involved, well, you're less involved with that, more involved with the corporate issues of Castle?

A. Yes.

Q. How about in terms of hiring employees, do you get involved with that at Castle?

A. At times, yes.

Q. I think you've been identified as being the treasurer of Castle.

A. Um-hmm.

Q. Is that correct?

A. Yes.

Q. Do you know what your responsibilities as treasurer are, if they're any different than what you've already told us?

A. They're no different.

Q. And did you ever sign any contracts on behalf of Castle?

A. Yes.

Q. And did Castle ever borrow any money?

A. Yes.

Q. And did you ever sign, as a personal guarantor?

A. Yes.

Q. Who did Castle borrow money from, from any banks?

A. No.

Q. Dan Clifford spoke yesterday about something called re-renting, where South Shore would rent equipment to Castle that Castle would then rent out to third parties. Do you ever recall that happening?

A. I don't recall if South Shore would have a piece of equipment sitting, and Dan would have a customer, probably. But I don't recall specifics.

Q. Do you remember what the highest receivable balance was due Castle from South Shore?

A. I don't.

Q. Did there come a time when South Shore had a high -- I'm sorry. Did there come a time when Castle had a large receivable that was owed by South Shore to Castle?

THE WITNESS: South Shore to Castle?

MR. SCHWARTZ: Yes.

A. Yes.

Q. And at the time that Castle had this large receivable that South Shore owed it, how did Castle paid its other creditors during that time?

THE WITNESS: How did Castle pay?

MR. SCHWARTZ: Yes. If it had this large receivable that South Shore owed it?

A. It was probably tough to pay creditors.

Q. Now, as president of South Shore, did you make a decision not to pay Castle for certain equipment rental?

A. Yes.

Q. And why did you make that decision?

A. Because I had other people banging on the door for money, and Castle was probably the easiest people not to pay.

Q. And why would they be the easiest people not to pay?

A. Because I own the company.

Q. Now, I guess the flip side of that question, which is, as president of Castle, when South Shore's account became delinquent, what efforts did Castle make to try to collect South Shore?

A. An internal document. I mean, it would be, I would get a piece of paper saying Castle owed the money, I mean, South Shore owed the money, and there was, like, other vendors that South Shore I didn't have the money to pay Castle. South Shore was in bad financial shape.

Q. When did South Shore first become in bad financial shape?

A. 2004.

Q. Did Castle have an account at Freedom Bank?

A. No.

you know.

MR. DEMELLO: Objection.

A. Don't know.

MR. SCHWARTZ: That's a fair objection. Let me ask it differently.

Q. Why did you sign this indemnity agreement?

A. So I could get bonds for South Shore's projects.

Q. And do you understand this indemnity agreement to require you and others to indemnify U.S. Fire for losses it incurred in connection with issuing those bonds?

MR. MULHEARN: Objection.

MR. DEMELLO: Objection.

Q. Your understanding?

THE WITNESS: My understanding of me signing the document.

MR. SCHWARTZ: Your understanding of the reason why you were signing the document.

MR. DEMELLO: Objection.

A. Yes.

Q. And I guess, did U.S. Fire issue bonds for the Earl Street and West End projects in New Bedford?

A. Yes.

Q. And did U.S. Fire issue bonds for the Burrillville

project?
A. Yes.
Q. And is Castle claim in connection with equipment rental on the Earl Street and Burrillville project?
A. Yes. Castle, yes.
Q. And I guess, do you understand that if U.S. Fire pays Castle on those claims, that you would be obligated to indemnify U.S. Fire for those payments?
MR. DEMELLO: Objection.
MR. MULHEARN: Objection.
THE WITNESS: Am I aware of that?
MR. SCHWARTZ: Yes.
A. Sure, yeah.
Q. Do you recall a Castle client called General Excavating?
A. I don't, no.
Q. How about a Castle client called Bill Ray?
A. Yes.
Q. Do you remember whether or not Castle stopped renting equipment to Bill Ray?
A. I'm not sure.
Q. How about, do you remember a Castle client, AJ Construction?
A. Yes. I remember AJ.
Q. Do you know if Castle stopped renting equipment to

A. No.
Q. If we go back, do you have a copy of Clifford Number 7? If you can look at page seven of that document, which is towards the end of the document, there's a couple of different reports in here, but I'm looking at the receivables open as of fiscal period 26, December, 2006 detail. And it has a date of 6-20-07, 2:29 p.m. Do you see the entry there for South Shore?
A. Yes.
Q. And if you look at the column for over ninety days, it has a total of $441,011.96.
A. Yes.
Q. And you can see, if you look at the actual invoices, that many of the invoices, I guess, I would say many of the invoices, it looks like the majority of the invoices are from 2005. And I guess my question to you is, as president of Castle Equipment, why did Castle Equipment let those 2005 invoices age to become such a large receivable?
MR. MULHEARN: Objection. You can answer, if you know.
A. I think I answered your question before. It was easy not to pay me, basically.
Q. And was that because as president of South Shore and

as president of Castle, you controlled the business operations of both companies?

MR. MULHEARN: Objection.

MR. DEMELLO: Objection.

A. No.

Q. Let's break it down, then. Were you the president of South Shore Construction?

A. Yes.

Q. Were you and are you, continuing to until today, the president of Castle Construction?

A. Yes.

Q. Did you control the business operations of South Shore Construction?

MR. MULHEARN: Objection. You can answer.

A. If money came in, I would have paid them. I would have paid Castle. The company wasn't doing good, so I didn't have the money to pay Castle.

Q. Did you control the business operations of South Shore Construction?

A. Yes.

Q. And do you continue to control the business operations of Castle?

A. Yes.

Q. Did South Shore pay any other vendors in 2005?

A. Yes.

Q. Did South Shore pay any vendors in the early part of 2006?
A. Yes.
Q. Is it fair to say that South Shore did not pay Castle in 2005?
A. I don't recall.
Q. Well, is it fair to say that, looking at this document, that South Shore did not pay Castle the open invoices shown on this receivable aging report in 2005?
A. It's fair to say that, yes.
Q. And is it fair to say that South Shore did not pay Castle the invoices shown on this exhibit for 2006?
A. Yes.
Q. As president of Castle, did Castle file a claim against South Shore in South Shore's receivership?
A. Not sure.
Q. And if U.S. Fire has to pay Castle in this litigation, how do you intend to repay U.S. Fire?
MR. MULHEARN: Objection.
MR. DEMELLO: Objection.
A. I'm not sure.
MR. SCHWARTZ: That's it. Thank you.
(Deposition ended at 11:32 p.m.)

C E R T I F I C A T E

I do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of the Court, especially, but without restriction thereto, under Rule 30 of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

I further certify that neither the deponent nor any party requested a review of the transcript.

IN WITNESS WHEREOF I have hereunto set my hand this 12th day of June, 2008.

JANE F. CORMIER, CSR
NOTARY PUBLIC
MY COMMISSION EXPIRES: 1/19/2010